UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------X
NATIONAL LIABILITY AND FIRE
INSURANCE CO.,

                    Plaintiff,            <u>MEMORANDUM AND ORDER</u>
                                            15-CV-6352(DRH)

        -against-

RICK'S MARINE CORP. AND ADAM
WEINSTEIN,

                    Defendants,
--------------------------------X
RICK'S MARINE CORP.,

            Third-Party Plaintiff,

        -against-

THE MOTOR VESSEL PELAGIC, its
Engines, Tackle, Appurtenances,
etc., <u>in</u> <u>rem</u>,

            Third-Party Defendant.
--------------------------------X

A P P E A R A N C E S:

Attorneys for Plaintiff National Liability
& Fire Insur. Co.:
    Nicoletti Hornig & Sweeney
    88 Pine Street
    Seventh Floor
    New York, New York 10005
      By: William M. Fennell, Esq.
          Cali L. Chandiramani, Esq.
          Guerric S.D.L. Russell, Esq.

Attorneys for Defendant/Third-Party Plaintiff Rick's
Marine Corp.:
    Kennedy, Lillis, Schmidt & English
    75 Maiden Lane
    Suite 402
    New York, NY 10038-4816
      By: Craig S. English, Esq.

Attorneys for Defendant Adam Weinstein:
    Rosenberg & Pittinsky, LLP
    232 Madison Avenue

Suite 906
New York, NY 10016
By: Laurence D. Pittinsky, Esq.

HURLEY, Senior District Judge

The purpose of this decision is to provide my Findings of Fact and Conclusions of Law as required by Federal Rule of Civil Procedure 52. The case was tried before me, non-jury, on October 2, 3, 4 and November 13, 2018, with the post trial memoranda of counsel being fully submitted by April 1, 2019.

## Background

This action arises from the sinking of a marine pleasure vessel, the Pelagic, which was owned by defendant Adam Weinstein ("Weinstein"), and serviced, stored and launched by Richard Dillworth ("Dillworth"), the owner and operator of defendant Rick's Marine Corporation ("RMC"). Upon being launched at the RMC boatyard on May 8, 2015 – after being stored at that location for the winter of 2014-2015 – it sank within hours.

As a result of its sinking, the Pelagic was declared a total loss, leading the insurer of the vessel, plaintiff National Liability and Fire Insurance Co. ("National"), to pay the $290,000 face amount of the policy to its insured Weinstein. Weinstein then transferred Pelagic's title to the insurance carrier as the subrogee of its perceived causes of action against RMC for the sinking.

RMC maintains that it is the aggrieved party. In its

view, the boat was delivered to the marina in the Fall of 2014 for repairs, winter storage, and for launching in the Spring with a causative latent defect, explained _infra_.  Based on that belief, RMC seeks, _inter alia_, to recover damages to the dock to which the Pelagic was tethered at the time of its submersion.  In addition, RMC has refused to release the Pelagic, such as it is, to National until it is paid certain sums predicated on an asserted maritime lien.

Nature of the Affirmative Relief<br>Sought by the Parties

The parties' divergent positions as to the reasons leading to the loss of the vessel and related issues have produced multiple claims being leveled against one or more of the captioned parties.

1.  National's Claims Against RMC,<br>as Subrogee of Weinstein and Its<br>Contingent Claim Against Weinstein

The relief sought by National, as enumerated in the "WHEREFORE" clause of its "FIRST AMENDED COMPLAINT" is as follows:

> (i)  against Defendant Rick's Marine Corp. declaring that the M/V PELAGIC is not subject to any maritime lien, mechanics lien, or other lien in favor of Defendant Rick's Marine Corp;

> (ii) in the alternative, to the extent Defendant Rick's Marine Corp. has a lien against the M/V PELAGIC, then judgment against Defendant Adam Weinstein for breach of his sales contract with Plaintiff National

3

warranting title to be free and clear of all liens and encumbrances, awarding Plaintiff National (1) general and consequential damages including, but not limited to, the impairment of the use and marketability of the M/V PELAGIC, diminution in value, costs and fees relating to the detention of the vessel and in securing the release of the vessel (including surveyor, salvage, and attorneys' fees), the cost of satisfying the lien, and all amounts Plaintiff National is found to be owing to Defendant Rick's Marine Corp. to clear title to the vessel, and (2) that the M/V PELAGIC be released to Plaintiff National while Defendant Rick's Marine Corp. disputes its claim with Defendant Adam Weinstein;

 (iii) directing the marshal or designated third-party to seize the M/V PELAGIC on behalf of Plaintiff from the unlawful possessor, Defendant Rick's Marine Corp. and awarding Plaintiff possession of the vessel together will all of Plaintiff's damages, costs, and expenses arising from the wrongful conversion of the vessel and arising from effectuating the release of the vessel;

 (iv) awarding to Plaintiff any diminution in the vessel's value due to the improper detainment or conversion of the property, the equivalent daily charter hire for a vessel comparable to the M/V PELAGIC, any damage to the vessel, and loss of market for the vessel since the time the M/V PELAGIC was lawfully sold to Plaintiff National through the date the vessel is released to Plaintiff National's custody;

 (v) awarding Plaintiff National its general and consequential damages as a result of Defendant Rick's Marine Corporation's wrongful and/or unworkmanlike repairs, services, winterizing, and/or launching of the vessel resulting in its sinking and total loss;

 (vi) declaring that [the] marine

insurance policy issued by Plaintiff National
to Defendant Adam Weinstein [does not cover[1]]
breaches of contract, including in particular
Plaintiff National's breach of contract claim
in the original Complaint (and in this
Amended Complaint) and, consequently,
Plaintiff National has no duty to defend or
indemnify Defendant Adam Weinstein;

       (vii) awarding to Plaintiff its
costs and attorney's fees; and

       (viii) for such other and further
relief this Court may deem just [and]
equitable . . . .

First Amended Complaint (DE 9) at 14-15.[2]


    2.  Affirmative Relief Sought by
        Weinstein in His Crossclaim
        Against Defendant RMC as Set Forth
        <u>in His Answer to National's Complaint</u>

    In its Answer to National's First Amended Complaint,

Weinstein denies the substance of National's claims, and lists an

---

   [1]  The WHEREFORE clause in the FIRST AMENDED COMPLAINT,
subparagraph (vi), describes a maritime insurance policy being
issued to Weinstein "for breaches of contract."  Reference to the
body of the insurance contract indicates that the quoted language
seemingly constitutes a scrivener's error.  I took the liberty of
modifying the language used to reflect the message apparently
intended to be conveyed by National vis-a-vis its obligation to
defend and indemnify Weinstein with respect to RMC's claim "for
services rendered."  First Amended Compl. ¶ 70; <u>see also</u> <u>id.</u> at ¶
71 ("Breaches of contract are clearly excluded from the Policy
and, therefore, there is no duty to defend or indemnify Defendant
Adam Weinstein with respect to such claims.").

   [2]  Some of the above quoted items of relief sought by
National were not pursued at trial.  By way of example, National
includes within its demand for damages a sum reflecting the
"daily charter hire for a vessel comparable to the M/V Pelagic"
absent any suggestion, no less evidence as to what that sum might
be. (First Amended Compl., WHEREFORE clause ¶ iv.)

array of affirmative defenses, followed by four crossclaims against RMC. The first seeks damages for RMC's purported negligence in sinking the Pelagic to the extent that the fair market value of the vessel and its gear exceeded the $290,000 Weinstein received from National.

The second crossclaim asks for the same relief but under a breach of contract theory, while the third asserted cause of action is premised on the law of bailment.

Weinstein's final and fourth crossclaim against RMC is contingent in nature: if National prevails against Weinstein on its breach of warranty claim pertaining to the Pelagic being transferred free and clear of any liens, then Weinstein "asks for contribution and/or indemnification, in whole or in part, and judgment over and against Rick's Marine, for any amount that Weinstein is obliged to pay, together with the reasonable attorneys' fees, expenses and costs that Weinstein incurs in the defense and prosecution of this action." (Weinstein's Answer to Amended Compl. with Crossclaims (DE 13) at 11.)

RMC denies any liability as to Weinstein's crossclaims and asserts thirteen affirmative defenses. (RMC's Reply to Crossclaim (DE 17).)

> 3. Affirmative Relief Sought by
> RMC in Its Crossclaim Against
> Defendant Weinstein as Set Forth
> <u>in Its Answer to National's Complaint</u>

In its Answer to National's First Amended Complaint,

6

RMC asserts various affirmative defenses, followed by a crossclaim against Weinstein for services provided. (RMC's Answer to Amended Complaint with Counterclaims (DE 10) at p. 13-18.)

Weinstein denied RMC's crossclaim by an answer containing twenty-three affirmative defenses invoking such theories as the "doctrine of accord and satisfaction" (Second Affirmative Defense), full payment of "all monies due" (Seventh Affirmative Defense), and "Rick's Marine did not perform the Repairs and Services for which Rick's Marine claims payment is due" (Twenty-First Affirmative Defense). (Answer to Co-Defendant Rick Marine Corp.'s Crossclaim (DE 14).)

### 4. RMC's Third-Party In Rem Complaint Against the Pelagic[3]

Two causes of action are alleged in RMC's third-party complaint against the vessel, to wit, one for sums allegedly due, and unpaid by Pelagic's owner relating to "authorized and necessary services, work and repairs . . . [done] to the said vessel" (First Cause of Action), and the other for unpaid storage incurred as a result of the Pelagic's stay at the boatyard. As to each a maritime lien is asserted. (RMC's Third-Party Complaint

---

[3] Evidence pertaining to RMC's in rem action against the Pelagic was not presented at trial and is, accordingly, deemed abandoned. As a practical matter, however, this seemingly is of no consequence because RMC has a lien on the vessel for unpaid services rendered – as explained later in the text –, and the Pelagic was valueless by the time of trial. (See, e.g., Trial Tr. at 46:1-5.)

(DE 15) at pp. 6-9.)

Format

The event which gave rise to the multiple claims outlined above was the sinking of the Pelagic.  Accordingly that will be the initial subject addressed.

> Findings of Fact and Conclusions of Law
> Regarding the Purchase of the Pelagic, its
> Delivery to RMC in November 2014 and its
> Sinking Upon Being Launched in May 2015

1.  Weinstein purchased the 39 foot Pelagic in June 2014 for a sum "in excess of $300,000."  (Trial Transcript ("Tr.") at 272:8.)

2.  Immediately after purchase, Weinstein "with three experienced captains" on board sailed the Pelagic from its point of purchase, viz. in South Carolina, to New York, absent "any instances of leakage" being experienced.  (Id. at 97:22-98:5.)

3.  Prior to taking that "three" or "four" day trip, the Pelagic successfully completed a shake-down cruise in open seas.  (Id. at 98:9-24.)

4.  Weinstein operated the vessel "through the summer" of 2014 without incident, and delivered the boat to RMC in "November of 2014."  (Id. at 97:9-16.)

5.  RMC operates Rick's Marine, which is a marina and vessel repair facility located in Freeport, Nassau County, New York.  (Id. at 280:20-23.)  RMC's "owner and operator" was and is Dillworth.  (Id. at 280:17-19.)

8

6.   Weinstein delivered the Pelagic to Rick's Marine in November 2014 for the purposes of (a) "winteriz[ation]," (b) "stor[age]", (c) "for certain repairs" to be made and, finally (d) to be "launch[ed] . . . back into the water in the [S]pring." (Joint Post-Trial Order, [DE 45] Stipulated Facts (VIII); <u>see also</u> Tr. 292:11-293:2.)

7.   Weinstein had "no idea how to winterize a boat" (<u>id.</u> at 115:3-13), and, accordingly RMC, agreed to, and did perform that process (<u>id.</u> at 123:23-124:17; Nat'l Ex. 9).

8.   The reported details of the winterization process done by Dillworth and/or an assistant, (Tr. at 302), are recited in the company's invoice. They include "drain[ing] SW [i.e. salt water] washdown [and] run[ning] non-tox [antifreeze] through all drains and strainers." (Nat'l Ex. 9.)  Whether the invoiced non-tox antifreeze was ever added to the SW washdown systems is questionable.  At Dillworth's pretrial deposition he testified that it was not.  (Tr. at 316:21-25.)

9.   With respect to the Spring launching, that was done by Dillworth and his "son's godfather, John Galvin" ("Galvin"). (<u>Id.</u> at 362:8-17.)  They did not do "a full bow to stern inspection of the vessel while it was on land before it went into the water." (Tr. at 361:17-25.)

10.  RMC did not check the bilge pumps to determine whether they were operating properly before launching.  (Tr. at

336:12-15.)

11.  The Pelagic was launched somewhere between 1:00 and 1:30 p.m. on May 8, 2015.  (Tr. at 336:24-337:2.)  Dillworth remained at the marina for four hours or less before catching a 5:08 p.m. train for a Rangers hockey game at Madison Square Garden.  (Id. at 336:20-337:1.)  The Pelagic was one of seven or eight boats he and his assistant launched that day yet he did not assign anyone to keep an eye on any of the vessels during his absence.  (Id. at 337:8-11.)  Dillworth returned to the marina at around 1:30 a.m. on May 9 by which time the Pelagic had sunk. (Id. at 337:25-338:10.)

> RMC's Position as to Facts Bearing on
> the Bailment Issue Discussed Infra

12.  Before discussing the "certain repairs" RMC agreed to perform and their relevance to the present dispute, it is important to understand Dillworth's specific position as to the cause of the sinking.  In his view, "[t]he cause of the sinking was the failure of a hose clamp, and a loose — fitting hose, which were unrelated to any alleged act or omission of RMC." (Post-Trial Memo of RMC (DE 71) at 12.)  The referenced hose was a part of an onboard saltwater washdown system, which device permitted an operator to hose-down the decks of the Pelagic using seawater obtained through a seacock.

Dillworth maintains that the evidence at trial

established that the subject hose "fit loosely on the seacock valve" and came dislodged when the single clamp holding the hose in place ruptured due to overtightening.  (Id. at 13; see also Tr. 423:21-24.)  That, in turn, caused seawater to course through the open, below waterline seacock directly into the hull.

The separation of the hose from the through-hull seacock fitting, the argument continues, is said by RMC to have occurred long after the winterization process was completed, specifically in the brief interim between the vessel's launching and its sinking several hours later while still at the marina and under the exclusive control of RMC.

But why wasn't the hose problem detected and corrected during the Fall winterization by RMC?  That query brings us to the repair issue advanced by Dillworth regarding the repairs the marina agreed to undertake, and those Weinstein indicated he would handle himself or otherwise address.  In that regard, RMC refers to several emails exchanged with Weinstein.  The first email is from Weinstein to Dillworth asking in essence for price quotes for twelve listed repair "projects."  Number 8 on the list reads: "Fix raw water wash down."  (RMC Ex. C at AW0194.)  In response, RMC's Dillworth estimated "[a]t most a few hundred, could be only a minor wiring issue."  (RMC Ex. D, third page, item 8, black text.)  Of note, no mention is made by him of a singular overtightened clamp securing a loose tube to the seacock

apparatus.  This suggests that Dillworth did not look at the washdown before providing an estimate or, if he did, did not see the supposed deficiency now cited.

In any event, Weinstein, after receiving repair cost estimates from Dillworth, sought input from his friend, Stephen Feinstein ("Feinstein") as to reasonableness of the estimated charges.  As to item 8, Feinstein told Weinstein that the raw water washdown "works fine, issue is with quick connect hose to fitting which activates the constant pressure pump, just needs a different type of hose connection."  (RMC Ex. C, third pg., numbered item 8, red text.)  "So don't pay him [viz. Dillworth], we will get another hose connector." (Tr. at 159:15 to 160:24.) Feinstein contacted Dillworth directly consistent with that conclusion whereupon Dillworth indicated item 8 would not be addressed.  (Tr. at 163:4-13.)

In sum, the gravamen of RMC's position disclaiming responsibility for the sinking of the Pelagic is that the vessel had a latent defect in its washdown system upon delivery to the marina in November 2014, and that Dillworth was told at that time not to address item 8 on Weinstein's list.  Dillworth contends that that communication eliminated the need for him to include checking that part of the washdown system as part of the launching protocol in May 2015 to assure it was then safe to place the vessel in the water.

13. RMC's labeling of the defect as "latent" constitutes a misnomer. A condition is latent if it is "present and capable of becoming[], though not now visible, obvious, active or symptomatic." Meriam-Webster's Collegiate Dictionary, Eleventh Ed. pg. 702; see also Kane v. Pater M. Moore Const. Co., Inc., 145 A.D. 3d 864, 868, (2d Dep't 2016)("If a defect could not have been discovered by a layman, even by inspection, it is considered a latent defect.").

14. Here, Dillworth highlighted during his testimony that the cause of the mishap was an obviously misfitted hose improperly secured by a single overtightened clamp instead of two properly tightened clamps. (See, e.g., Post Trial Reply of RMC to the Post Trial Submission of Plaintiff (DE 82) at p. 1.)

15. RMC, as previously noted, not only launched the Pelagic in May of 2014, but also winterized the vessel in the Fall of 2014. In performing the latter function, Dillworth or his assistant had "hands on" contact with the salt water washdown system. (See Nat'l Ex. 9, p.2 listing services rendered to Weinstein by RMC (". . . drain SW washdown, run non-tox through all drains and strainers [and] winterize SW livewell circulating pump . . . ."); see also Tr. at 451:6-23.) So in winterizing the salt water washdown, Dillworth, again, or his assistant had occasion to see, and, in all probability did see, the purported defects now mistakenly labeled by RMC as "latent."

13

16.  Central to RMC's argument is the contention that the loose, overtightened hose and the manner in which it was attached to the seacock barb constituted, in essence, an obvious accident waiting to happen.  (<u>See, e.g.,</u> RMC Post-Trial Reply (DE 82) at 1.)  Whether Dillworth's "latent defect" view as to the cause of the loss is correct is at best problematic based on the credible evidence adduced at trial.  But more importantly for present purposes, having been alerted to a problem with the saltwater washdown system via Weinstein's request for a cost estimate for its repair, and having been involved in the winterization process of the system, why didn't Dillworth or his assistant at least check to see if the needed repairs were done before placing the vessel in the water?  If such inspection disclosed that the perceived hazard remained unaddressed, Dillworth should have decided not to do the launch until the defect was remedied.

17.  Did the supposedly misshapen tubing become dislodged due to a single overtightened clamp giving way as RMC contends, or was the cause something else such as, <u>e.g.,</u> the freezing of the line attributable to improper winterization?  Without an answer to that question, the bailment presumption of negligence by the bailee, discussed <u>infra</u>, comes into play.

18. Dillworth's related speculation about the tube becoming dislodged sometime during the brief period separating

14

the Pelagic's launching and his return from the Rangers game is not credible.  Instead, it appears to be a misguided effort to excuse his inadequate pre and post launch inspections needed to assure the vessel was watertight.  (See, e.g., Tr. at 361:16-25 (lack of bow to stern inspection before boat placed in water); id. at 379:4-18 (hoses and seacocks [except those leading to engine] not checked pre launch); id. at 381:6-382:15 (Dillworth testified he did not check hoses, clamps, or all the seacocks after Pelagic was launched)).

Moreover, his reliance on the testimony of Christopher Squeiri, a fellow marina operator in Freeport, to suggest that the boat was still floating high and dry hours after its launching is unavailing.  Mr. Squeiri testified that he saw the Pelagic at "about 5:00 [p.m.]" on May 8, 2015 in the water absent any list or other evidence that it was being flooded.  He explained he knew it was the Pelagic due to its "light blue hull."  (Tr. at 510:7-511:21; see also id. at 516:16-18 and 523:17-524:5.)  Given that the subject vessel's hull was white, not blue, (id. at 524:18 - 525:2), it is clear to me that the boat he saw the afternoon of the sinking was not the Pelagic and, as a result, his testimony is not germane.

19.  Based on evidence presented at trial, I find it is more probable than not that the Pelagic was delivered into the exclusive custody and control of RMC in the Fall of 2014 in good,

seaworthy condition.

20.   I further find that had the appropriate launching protocol been followed as convincingly explained by Captain John Lowe ("Lowe") of Lowe's Marine Survey, the Pelagic would in all probability not have sunk.  (Tr. at 588:17-25.)  But several of the required steps in that protocol were bypassed by RMC.

21.   For instance, one of the steps required by the protocol was checking the vessel's bilge pumps to assure they were operational.  (<u>Id.</u> at 589:1-591:17.)  However, Dillworth acknowledged that he didn't "test whether the bilge pumps operated."  (<u>Id.</u> at 336:12-15.)  That oversight is significant because any one of the several pumps had the capacity to keep the vessel afloat, <u>i.e.</u>, to expel more water from the bilge than entered the hull from the untethered open seacock.  (<u>Id.</u> at 593:18-594:12.)

22.   Since the Pelagic was delivered to RMC in seaworthy condition and remained under its exclusive custody and control up to and through its launching, there is a rebutable presumption that RMC's negligence as the bailee of the vessel caused its loss.  As explained in <u>Goudy & Stevens, Inc. v. Cable Marine, Inc.</u>:

> [W]hen the bailor shows delivery to a bailee
> and the bailee's failure to return the thing
> bailed, he makes out a <u>prima facie</u> case of
> negligence against the bailee, and it then
> becomes the duty of the bailee to come
> forward with the evidence to explain its

> default by showing facts and circumstances
> sufficient in law to exonerate it from
> liability for the damage.

924 F.2d 16, 18 (1st Cir. 1991)(internal quotation marks and citations omitted). See also Muller Boat Works, Inc. v. Unnamed 52' House Barge, 464 F. Supp. 2d 127, 146-47 (E.D.N.Y. 2006); Nat'l Ex. 28, pp. 9-10 (Lowe's "Comments on launch protocol").

23. The presumption is rebuttable. But RMC's effort to accomplish that goal via reference to a latent defect supposedly present upon delivery of the vessel to the marina, has proven to be unavailing. Thus the presumption of negligence remains unrebuted. See Johnson's Branford Boat Yard. Inc. v. Yacht Altair, 260 F. Supp. 841, 844 (D. Conn. 1966). That alone establishes that National has met its burden of proof as to RMC's liability.

24. Parenthetically, even if, arguendo, the presumption is culled from the analysis, the same result follows given the negligent departures from the appropriate launching protocol explained by Captain Lowe as previously referenced.

25. In sum, National has proven that RMC's negligence - via the aid of the bailment presumption - was the reason the Pelagic sank upon launching.

26. In reaching the above conclusion, I considered RMC Exhibit G,[4] the preliminary report prepared by marine surveyor

---

[4] RMC Ex. G also appears in the record as A.W. Ex. X.

Anthony L. Fazio ("Fazio"). The report, dated May 14, 2015, was prepared at the request of National and offered into evidence by RMC at which time it was received subject to connection under Federal Rule of Evidence 104(b). (Tr. 88:17-23.) One of the links required consisted of a proper foundation for its consideration as a business record under Rule 803(6). (See generally Memorandum & Order, dated October 19, 2018 (DE 65).) In any event, the parties eventually agreed that the exhibit was a business record thereby obviating the need to call a foundational witness. [But its trustworthiness was disputed by National, coupled with the unconvincing argument that such claimed deficiency barred its admission.] I find that the specifics of National's argument goes to the weight to be afforded to RMC Ex. G, not to its admissibility. Accordingly the exhibit has been considered by the Court as evidence. However, given that Fazio's report is predicated in substantial measure on questionable information provided solely by an interested principal of RMC, viz. Dillworth, it does not give cause to alter my conclusion regarding RMC's liability for the loss of the Pelagic. Simply put, although the exhibit survives the trustworthiness hurdle to its admission, its weight, given the attendant circumstances, is de minimis.

27. By way of an example of the problematic nature of Fazio's conclusion – offered in support of RMC's "latent defect"

theory – is his "finding" that "the hose detached from the
fitting allowing raw water to flood in <u>according to Rick
Dillworth</u>." (RMC Ex. G (emphasis added).)  In addition, given
the nature of the break, Dillworth's testimony that he found the
broken single clamp in the bilge totally separated from the
tubing rather than still attached to it, was seriously questioned
by Fazio as well as Lowe.  (<u>See</u> Nat'l Ex. 8, NAT0594 (as to
Fazio); Tr. at 637:13-638:3; Nat'l's Proposed Findings of Fact
and Conclusions of Law at p. 5, n. 5(as to Lowe).)  Indeed, the
likelihood of the clamp being totally dislodged from the tubing
was viewed by Fazio as "seem[ingly] impossible." (Nat'l Ex. 8,
NATO594.)

And incidentally, Fazio in his report opines that
"[r]esponsibility" for the loss "[m]ay lie, with the marina
facility that launched the vessel in the owners [sic] absence
that may not have provided due diligence in ensuring the vessel's
watertight integrity. (Fazio's May 14, 2015 Preliminary Report
1, at 7, NATO141.)

> RMC's Claim Against Weinstein for Damage
> to Marina's Dock and Travel-lift Sling is
> <u>Found to be Without Merit</u>

28.  Since a preponderance of the credible evidence
establishes that Weinstein delivered the Pelagic to the marina in
sound condition, and RMC has failed to rebut the resulting
presumption that its negligence as bailee caused the loss of the

vessel, it necessarily follows, and I so find, that Weinstein bears no responsibility for the captioned damages.

> Findings of Fact and Conclusions of Law as to Weinstein's Claim Against RMC for an Amount in Damages Equal to the Alleged Difference Between the Fair Market Value of the Pelagic Immediately Prior to Its Loss and and the $290,000 Received From National in Insurance Proceeds

29.    Weinstein called Frank Abbey ("Abbey"), a marine surveyor, to evaluate and assign a pre-casualty market value to the Pelagic.  (See Weinstein Ex. K-2, Abbey's resume.)

Abbey never "inspected" the Pelagic.  (Tr. at 496:4-6.) Instead, he referenced a source entitled "BUC Used Boat Price Guide" and like publications said to be used by marine surveyors to provide valuation figures to, inter alia, insurance companies. (See Weinstein Ex. K-1 and Tr. at 496:7-497:25.)  Based on that process, he opined that "the boat could have had a value range [of] $312,950 to $370,150" [or from] "$327,175 to . . . $386,975" (emphasis added).  (Id. at 498:10-17.)

The actual condition of a boat is an important factor in its evaluation.  (Id. at 504:3-5.)  Abbey assumed that the vessel was in so-called BUC condition, that is "in good average condition, typical age type and ready for sale."  (Id. at 501:8-14.)  But not only did he never see, no less inspect the vessel, he never spoke to the owner about its condition.  As a result, Abbey was unaware of its problems such as with its "engine

mounts" which, he conceded, would affect its value. (<u>Id.</u> at 501:20-24.) Similarly unknown to Abbey is what Weinstein paid for the vessel in "the [S]pring of 2014" before insuring it for $290,000. (<u>Id.</u> at 502:7-9.)

In sum, Abbey's testimony — which is essentially the lone predicate for this claim by Weinstein against RMC — falls far short of being convincing.

Accordingly, this crossclaim by Weinstein against RMC is rejected as unproven.

> Findings of Fact and Conclusions of
> Law as to Pre-sinking Repairs to the
> Pelagic and Resulting Lien Pending
> <u>Payment by Weinstein</u>

30. RMC furnished Weinstein with an invoice dated December 31, 2015 for pre-sinking repairs rendered in the amount of $21,045.95, later reduced to $17,602. (<u>See</u> RMC Ex. N and Tr. at 443:9-445:6; <u>id.</u> at 701:1-9.) Accordingly, RMC seeks to be awarded the reduced amount for the repairs he did to the Pelagic prior to its loss. (<u>See</u> Post-Trial Memo of RMC (DE 71) at 22.)

Dillworth testified that the invoiced tasks were performed and the associated cost remains unpaid (Tr. at 443:9-445:6); Weinstein has not offered evidence to the contrary.

But does the obligation for payment rest with Weinstein or National? Title to the Pelagic was transferred from Weinstein to National on May 30, 2015. (<u>See</u> RMC Ex. Y (first Bill of Sale) and Nat'l Ex. 3 (second Bill of Sale, dated June 23, 2015 which,

unlike its predecessor, lists the name of the transferee).)

Reference to the December 31, 2015 invoice indicates that the services rendered by their very nature all occurred before the May 8 casualty and while Weinstein owned the Pelagic. (RMC Ex. N.)  Thus payment of the outstanding invoice is Weinstein's obligation.[5]

In sum, Weinstein is responsible to RMC for the $17,602 in repair costs.

> Post-Sinking Storage Fees for the
> Pelagic are National's Responsibility
> but National is Entitled to
> Indemnification From Weinstein

31.  In RMC's "PRE-TRIAL STATEMENT WITH REGARD TO DAMAGES" (DE 52-1) filed on September 18, 2018, Dillworth, via RMC's crossclaim against Weinstein, lists the damages sought. With respect to then unpaid storage charges, the figure of $53,032.28 is provided with a supporting cite to invoice number 1086B.  (RMC Ex. T.)  The storage charges listed on that invoice all pertain to storage services provided _after_ ownership of the Pelagic was transferred from Weinstein to National.[6]  That

---

[5]  Absent from the bills of sale is anything remotely suggesting that Weinstein's indebtedness to RMC somehow became National's responsibility upon transfer.  In fact, a fair reading of the language in the sales instruments excludes that possibility.

[6]  By implication, it appears that all storage fees for the Pelagic incurred prior to the transfer from Weinstein to National were satisfied pre-litigation.

scenario certainly suggests that satisfaction of the subject storage charges are National's responsibility at least in the first instance.

National insists that the responsibility does not rest with it. Its primary argument in support of that position goes as follows: "[f]or a lien (if such is asserted by Rick's Marine)[7] to cover storage fees, the storage fees 'must be specifically authorized to be included as part of a garagekeeper's lien on a vehicle,'" (Reply by Plaintiff (DE 83) at ¶ 36 (quoting Grant St. Constr., Inc. v. Cortland Paving Co., 55 A.D.3d 1106, 1107, 865 N.Y.S.2d 762, 764 (3rd Dep't 2008).)

Here, National argues that it never agreed to pay for the post-transfer storage fees while the remains of Pelagic languished at the marina. However, that position is belied by the fact that it did pay storage charges to RMC for a significant portion of that period. (See Tr. at 34:19-35:12; id. at 347:21-25; and Nat'l Ex. 8.6 at NAT 0509.) By that act, it impliedly acknowledged its consent and corresponding obligation to pay the post-transfer storage fees as the titled owner of the vessel.

_____

[7] RMC is asserting a maritime lien for its unpaid services performed on the Pelagic, and legitimately so, under 46 U.S.C. § 31342(a) and N.Y. Lien Law § 1841). See generally Memorandum & Order, dated May 17, 2017, (DE 65), denying summary judgment to National on its conversion claim for RMC's refusal to release possession of the vessel due to outstanding invoices.

32.  As to the issue of indemnification, National contends that if it owes storage fees to RMC, it is entitled to indemnification from Weinstein.  That is so, we are told, given the terms of the two bills of sale.

Weinstein warranted in the May 30 bill of sale that the vessel was being "sold free and clear of all liens, mortgages or encumbrances of any kind" (RMC Ex. Y at 1), while the June 23 instrument recites "the seller(s) warrants that the vessel is free and clear of all liens, bills, mortgages, taxes or encumbrances of any nature or kind" (Natl's Ex. 3).

The above quoted language created an express warranty of a material fact, which warranty Weinstein clearly breached with respect to the repair services provided by RMC.  See generally Metro. Coal Co. v. Howard, 155 F.2d 780, 784 (2d Cir. 1946);  Trodale Holdings LLC v. Bristol Healthcare Inv'rs., L.P., 2019 WL 1300335, at *5 (S.D.N.Y. Mar. 21, 2019).  That Weinstein had not received an invoice for the repairs until well after both the loss and the transfer of title had occurred does not alter that result.

The lien came into existence at the time the services were provided.  See Odyssea Marine, Inc. v. Siem Spearfish M/V, 2016 WL 4259083, *3 (E.D. La. Aug. 10, 2016)(" A maritime lien attaches when the necessary good or service is provided, but the lien typically will remain inchoate and may not be enforced

24

(i.e., the vessel may not be arrested) until the debt has matured per the terms of the agreement (if any).").

National, following the vessel's transfer of title, sought its possession unsuccessfully. (See Tr. at 353:4-355:5.) In rejecting such requests, Dillworth relied on his "mechanic's lien." (Id. at 349:18-21.) Because of that lien, National was unable to accomplish its goal of obtaining possession of the vessel and, in the process, stopping the ever mounting storage fees. Had the vessel been free of liens as warranted by Weinstein, the post-transfer storage costs now sought by RMC to be recovered from National would have been presumably non-existent.

Under the circumstance, it is Weinstein's obligation to indemnify National for whatever sum it owes RMC for the post-transfer storage fees. Even though an invoice for the repairs had not yet been issued before National acquired title to the Pelagic, Weinstein should have settled that known open item with RMC instead of falsely representing to National the absence of any outstanding bills, liens or other encumbrances.

Amount Owed to RMC by National for
Post-Transfer Storage at the Marina,
and Ultimately by Weinstein Based on
His Breach of Warranty

33. The next question is how much does National owe to RMC for storage? Is it the amount sought by RMC, to wit

$53,032.28, or some lesser sum?[8]   Whatever it is, that is the figure to be awarded to National pursuant to its indemnification claim against Weinstein.

34.   Is the $53,032.28 sought by RMC unconscionable and thus unenforceable given that the sum sought considerably exceeds the post May 8-9 value of the vessel?  National posits that the answer to that question should be in the affirmative.  (See Natl's Reply (DE 83) to Proposed Findings of Fact and Conclusions of Law of RMC and Weinstein at p. 17.)  In support of that proposition, two lower court state cases are cited, viz. C.J.T. Corp. v. Solomon, 273 N.Y.S. 563 (Manhattan Mun. Ct. 1934) and Pollina v. Bergh, 346 N.Y.S.2d 318 (2d Dist. Ct. 1973)(citing C.J.T. Corp.).  I have read both and find neither helpful for present purposes.  All Weinstein had to do to eradicate the lien was to settle-up with RMC as to the authorized repairs done.  The notion that Weinstein may strip the marina of its lien by simply declining to recognize its obligation to make payment until storage costs exceed the value of the vessel is a proposition I decline to adopt on the authority provided.

35.   However, an alternate argument advanced in National's Reply is helpful.  That argument is as follows:

Rick's Marine's claim for storage fees is

---

[8] See RMC Post-Trial Findings of Fact (DE 72) at p. 23, para. 158; see also RMC Ex. T (a 9-01-18 invoice for post-casualty on-land storage).

> also unconscionable in light of the fact that
> Rick's Marine charged Weinstein $1,482 for
> five months of winter storage prior to the
> incident (Nat'l Ex. 9), which is $296.40 per
> month.  However, Rick's Marine now seeks
> $1,302.00 per month for storage (RMC Ex. T).
> If the Court awards any amount, it should be
> based upon the rate that existed prior to the
> casualty (i.e., $296.40 per month).

(Nat'l's Reply (DE 83) at 17.)

National's alternate argument has merit to the extent (a) that the record is devoid of evidence to suggest, no less establish, that National or Weinstein ever agreed, by conduct or otherwise, to pay the $1,302 per month now sought by RMC, and (b) RMC has not otherwise contradicted or challenged National's alterative suggestion for satisfying the outstanding storage fees.  (See Nat's Ex. 9.)

Accordingly, National is responsible for payment of storage fees to RMC in the amount of $296.40 per month for post transfer storage fees through the entry of judgment. Further, National is entitled to judgment against Weinstein in like sum on its claim for indemnification.

> The Insurance Policy Issued by
> National to Weinstein Does Not Provide
> Coverage for Breaches of Warranty
> or Other Contract-based Claims

36.  The Yacht Policy issued to Weinstein by BoatU.S., the marine insurance arm of National, covers the vessel and appurtenances thereto (Nat'l Ex. 2, p.2 of Policy), as well as

27

claims for "bodily injury or property damage for which the insured becomes legally liable through [the] ownership, maintenance or use of the insured boat" (id. at p. 10).  By its terms, the policy does not cover contract-based claims, such as National's claim against Weinstein for breach of warranty, unpaid repair bills, or storage fees.

Parenthetically, with respect to RMC's cause of action against Weinstein for harm to the marina's dock and sling caused by the sinking, National had a duty to defend pursuant to the coverage provision quoted in the last paragraph.  However Weinstein never asserted a counterclaim against National charging a failure to defend as to this matter[9] nor was the subject pursued by him during trial either by way of proof or argument.

For the above stated reasons, National's request for a declaration that it has "no duty to defend Defendant Adam Weinstein for National's cause of action for breach of contract" or otherwise is granted.

Amount Owed by RMC to National
<u>as Subrogee of Weinstein</u>

37.  National paid the $290,000 face amount of the insurance policy it issued to Weinstein following the Pelagic's

---

[9] See RMC's Answer to Natl's First Amended Complaint with Crossclaim, DE 10; see also Nat'l's Proposed Findings of Fact and Conclusions of Law, DE 74, at p. 24 ("At no time has Defendant Weinstein asserted a counterclaim in this action against National.").

loss.  That amount is some evidence of the vessel's value.
Commercial Union Ins. Co. v. M/V Bill Andrews, 624 F.2d 643, 649
(5th Cir. 1980).  No evidence was forthcoming suggesting a lesser
amount, while Weinstein's expert opined a value considerably in
excess of that number.  The Court thus concludes that the
Pelagic's value in May of 2015 was $290,000.00.  As subrogee,
National succeeds to Weinstein's rights to recover that amount
from RMC.

        38.  National also seeks to recover sums in excess of
the $290,000 it paid to Weinstein.  (National's Proposed Findings
of Fact and Conclusions of Law (DE 74) at p. 19-20.)  For
example, it requests an award of $6,794.49, that being the amount
it "paid to Rick's Marine to assist in the salvage of the vessel
and flushing of the engine and similar activities described in
the invoice after the sinking."  (Id. at p. 19.)  However, the
insurance policy issued to Weinstein (Nat'l Ex. 2), provides,
under the caption "Our Right to Recover," that "[y]ou may have
the right to recover from another party who is responsible for
your loss or loss to the insured boat.  If we pay your loss under
this policy, this right of recovery will belong to us up to the
amount that we have paid you."  (Nat'l Ex. 2 (DE 9-1) at 6.)  So
that $6,794.49 charge, and the other like expenditures National
moves to recoup from RMC, would seem barred as a result of the
above quoted provision unless there is some predicate other than

subrogation at play.  But what that other predicate might be remains wholly unaddressed in National's submissions.  For that reason, the items of relief requested in paragraphs 50, 51, 52, 53 and 54  (see Nat'l's Proposed Findings of Fact and Conclusions of Law (DE 74) at pp. 19-20) are denied.

39.  With respect to paragraph 55, (id. at p. 20,) there National asks to recover the salvage value of the vessel as it existed shortly after the sinking, which opportunity was purportedly lost due to "Rick's Marine's wrongful detention of the vessel."  (Id.)  As explained earlier, RMC had the right to detain the vessel based on its lien for unpaid repair services. Thus this claim necessarily fails.

Conclusion Regarding Findings of Fact
and Conclusions of Law, Together
With Damage Awards

For the reasons given above:

1. National has proven that RMC's negligence — via the aid of the bailment presumption – caused the loss of the Pelagic; accordingly, National is entitled to judgment against RMC in the amount of $290,000.00.

2.  Since RMC bears sole responsibility for the sinking, RMC's claims against Weinstein for damage to the marina's dock and sling are found to be without merit; accordingly, Weinstein is entitled to judgment dismissing this counterclaim.

3.  Weinstein has not proven that the Pelagic's market value immediately prior to its sinking exceeded its insured value of $290,000; accordingly his crossclaim against RMC for the unproven differential is rejected and RMC is entitled to judgment dismissing this counterclaim.

4.  RMC's crossclaim against Weinstein for pre-sinking repairs in the amount of $17,602.00 has been established as has the legitimacy of its concomitant lien on the Pelagic due to nonpayment; accordingly, RMC is entitled to judgment against Weinstein on this crossclaim in the amount of $17,602.00.

5.  Post-transfer storage fees for the Pelagic at RMC's — at the rate of $296.40 per month as earlier explained — are National's responsibility.  However, because of Weinstein's breach of warranty via his representation to National that the vessel was being transferred free of any liens, bills or other encumbrances, National is entitled to indemnification from Weinstein for the storage fees it is required to pay to RMC up to the date of this judgment; accordingly, RMC is entitled to judgment against National in the amount of $16,894.80 (57 months through February 2020) plus $9.88 per day from March 1, 2020 to the entry of judgment and National is entitled to judgment against Weinstein in like sum on its claim for indemnification.

6.  Upon satisfaction of the judgment for the outstanding repair bill and the outstanding storage fees,

National is entitled to possession of the Pelagic and accordingly, upon such payment RMC shall immediately make the Pelagic available for removal from the marina at National's expense.

7. National's request for a judgment declaring that it had no obligation under the marine insurance policy issued to Weinstein to defend and, if necessary, indemnify him with respect to National's breach of warranty and other contract-based claims is granted.

8. National's request to recover sums from RMC in excess of the $290,000 it paid to Weinstein is denied.

9. The claims asserted by the parties not specifically addressed above have been considered by the Court and determined to be devoid of merit and therefore are dismissed.

10. The Clerk of Court is directed to enter judgment in accordance with the foregoing together with post judgment interest pursuant to 28 U.S.C. § 1961 and to close this case.

Dated:    Central Islip, New York
          March 11, 2020


                              /s Denis R. Hurley
                              Denis R. Hurley
                              United States District Judge